UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

UNITED STATES OF AMERICA,

                Plaintiff-Respondent,

    v.

ELVEN JOE SWISHER,

                Defendant-Movant.

Case No. 1:09-CV-055-BLW
        1:07-CR-182-BLW

**MEMORANDUM DECISION
AND ORDER**

## INTRODUCTION

Pending before the Court are Movant Elven Joe Swisher's ("Swisher") Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (Dkt. 1) and Renewed Motion Under 28 U.S.C. § 2255 (Dkt. 18).  Having reviewed the Motions, the Government's Response (Dkt. 11), Swisher's Reply (Dkt. 13),[1] and the underlying criminal record, the Court enters the following Order dismissing the § 2255 Motion and the Renewed § 2255 Motion.[2]

---

[1] All further docket numbers shall refer to either the civil case or the criminal case as the context suggests.

[2] The Court has not directed the Government to respond to the Renewed Motion.

# BACKGROUND

Swisher alleges in his § 2255 Motion several claims of ineffective assistance of counsel most of which are based on conflict of interest. He alleges that defense counsel, M. Lynn Dunlap ("Dunlap") and Britt Groom ("Groom") had an actual conflict of interest arising out of their former representation of an individual by the name of David Hinkson ("Hinkson") and that their performance was deficient in several other respects unrelated to the alleged conflict of interest. The Court recently denied Swisher's Motion for Discovery (Dkt. 14). *See Order* (Dkt. 17).

In its Order denying discovery, the Court briefly summarized the background of this case. However, a more detailed statement of facts is warranted here due to the unusual circumstances leading up to Swisher's prosecution and his numerous allegations of ineffective assistance of counsel.

## 1.     Pre-Indictment

Swisher served with the United States Marine Corps on active duty from August 4, 1954 until August 3, 1957 when he was discharged into the reserves as evidenced by a DD-214 form signed by his personnel officer, Captain W. J. Woodring ("Woodring"). The boxes on the form for indicating any medals, awards, or commendations and for indicating any wounds received in combat were each marked "N/A." *See Resp.*, Ex. A, Dkt. 11-1.

In 1958, Swisher applied for and received benefits from the Veteran's Administration ("VA") for certain service-connected injuries. Over forty years later, in

2001, he applied for benefits for Post Traumatic Stress Disorder ("PTSD"). He claimed his PTSD arose from his participation and injuries received in a secret combat mission rescuing prisoners of war held in North Korea in August or September of 1955 while he was stationed at Middle Camp Fuji, Japan. The VA denied his claim because there was no record that the mission ever occurred.

In 2003, Swisher appealed the denial of his benefits. He supported his claim with a photocopy of a "replacement" DD-214 form – accompanied by a letter dated October 15, 1957 that appeared to be from Woodring – indicating that Swisher had received the Silver Star, Navy and Marine Corps Medal with Gold Star, Purple Heart, and Navy and Marine Corps Commendation Medal with Bronze V and that he was entitled to wear the Marine Corps Expeditionary Medal. *See Resp.*, Ex. C, Dkt. 11-2. The replacement DD-214 further indicated that Swisher had received multiple shrapnel and gunshot wounds in September of 1955 in Korea. *Id*. In support of Swisher's claim, Groom submitted affidavits to the VA stating that he had seen the documents and believed them to be authentic based on his experience as a Naval Intelligence Specialist with operational designation. The VA thereafter granted Swisher disability benefits for PTSD while also sending the documents to Headquarters Marine Corps to be authenticated.

During approximately the same time period, Swisher was a Government witness in a murder-for-hire case prosecuted in the District of Idaho over which visiting Judge Richard C. Tallman presided. *United States v. David Roland Hinkson*, CR-04-127-S-RCT. Swisher testified that based on his statements to Hinkson regarding his military

experiences, Hinkson asked him to torture and kill a federal Judge, an IRS Special Agent, and an Assistant U.S. Attorney.  *See United States v. David Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009), reh'g denied and dissent vacated and superseded, 611 F.3d 1098 (9th Cir. 2010).  During his testimony, Swisher wore what appeared to be a Purple Heart.

After cross examining Swisher during the Hinkson trial, defense counsel Wesley Hoyt presented to the Court a recently received letter from the National Personnel Records Center ("NPRC")  stating that Swisher's official military record did not indicate that he had been in combat or awarded any medals.  *Hinkson*, 585 F.3d at 1254.  Judge Tallman allowed counsel to re-open cross examination to question Swisher regarding the Purple Heart he was wearing.  *Id*.  After Swisher testified that he had received it following a post-Korean War classified mission to free prisoners of war, counsel challenged Swisher with the NPRC letter.  At that point, Swisher produced the replacement DD-214 which indicated he not only had been awarded the Purple Heart but also several other medals.  After denying counsel's motion for a mistrial, Judge Tallman instructed the jury to disregard the testimony about the Purple Heart.

Before the trial ended, the Court received, pursuant to subpoena, a certified copy of Swisher's complete military file.  The Government also presented a letter from Lt. Col. K.G. Dowling of the National Personnel Management Support Branch of the United States Marine Corps questioning the authenticity of both the replacement DD-214 and accompanying letter from Woodring.  The Dowling letter stated that Swisher had neither been in combat nor been awarded medals.  Judge Tallman excluded both the letter and the

file from evidence on the ground in part that they were "unauthenticated and facially inconclusive" as to whether Swisher lied about his combat experience. *Id*. at 1256. Hinkson was convicted of three counts of solicitation to commit a crime of violence in violation of 18 U.S.C. § 373.

Based on the doubt shed on Swisher's combat-related claims during the Hinkson trial, the VA investigated further and was advised by the Marine Corps that the replacement DD-214 was not authentic. The VA then terminated his benefits for PTSD. The Government subsequently sought an indictment against Swisher.

## 2.    Indictment, Discovery, and Trial

### A.    Indictment

Swisher was charged in a four-count Indictment with (1) wearing unauthorized military medals in violation of 18 U.S.C. § 704(a) including the Purple Heart, Silver Star Medal, Navy and Marine Corps Medal (Gold Star in lieu of the Second Award), and Marine Corps Commendation Medal with Combat "V;" (2) making false statements in violation of 18 U.S.C. § 1001(a)(2) to the VA that he was involved in combat operations, was awarded those medals, and suffered from resulting PTSD in order to obtain additional benefits; (3) making false statements in violation of 18 U.S.C. § 1001(a)(3) by using a forged, counterfeit, or falsely altered certificate of discharge from the United States Marine Corps in support of those claims; and (4) and theft of government funds in violation of 18 U.S.C. § 641 by effectively stealing disability benefits from the VA by presenting false testimony and using a forged DD-214 form to secure a higher disability

rating and increased benefits. *Indictment*, Dkt. 1.

**B.    Discovery**

Although the Court initially appointed counsel, Swisher subsequently retained Dunlap who thereafter secured two continuances of the trial date to engage in discovery. On various dates, Dunlap requested from the Government documents from the Department of Defense, United States Marine Corps, and the VA among other agencies. *See, generally, Aff. in Support of Mot. to Continue*, Dkt. 16-1; *Notice of Req. for Disc.*, Dkt. 18; *Stipulation for Mot. to Continue*, Dkt. 20; and *Affs. in Support of Third Mot. to Continue,* Dkts. 27 and 28.

In conjunction with a third Motion to Continue, Dunlap filed a Motion to Compel seeking an order from the Court for the Government to produce copies of the following documents: (1) all DD-214s issued by Woodring during his tenure at Bangor, Bremerton Naval Station;[3] (2) all records pertaining to an incident at Bangor involving an individual with an M-1 on the roof of the barracks threatening to shoot people; (3) the Inspector General's travel itineraries during the period of time of Swisher's alleged court martial in 1956; (4) documents from the Redline Brig in Middle Camp, Fuji, Japan during the time Swisher was incarcerated as Prisoner No. 21 for three days; (5) documents pertaining to injuries he suffered at Middle Camp, Fuji, Japan, including medical day log, incident reports, and grenade range training logs; and (6) documents relating to correspondence of General Graves B. Erskine, Special Operations Commander in 1954 and 1955, regarding

---

[3]  Swisher served at Bremerton Naval Station immediately prior to discharge from active duty.

the POW situation in North Korea, his military biography, his correspondence with Lt.

Col. Marshall (Base Commander), his correspondence with Middle Camp or South Camp,

his travel itineraries, and the visitor's log for Middle Camp. *Aff. in Supp. of Mot. to

Compel*, Dkt. 30. According to Swisher, General Erskine was responsible for and in

charge of all clandestine or classified military operations in the Korean theater in 1955.

*Id*. at 6-7.

The Government opposed the Motion to Compel on the grounds that it had

engaged in open-file discovery, had exceeded the discovery obligations of Fed. R. Crim.

P. 16, and had fully disclosed any *Brady* material in its possession. *Resp. to Mot. to

Compel*, Dkt. 32. The Government had provided its entire file together with the complete

VA file, Swisher's military personnel file (which consisted of approximately 150 pages),

and other unrelated personnel documents regarding Swisher's service. *Id*. at 2.

The Government advised that it had also requested documents from Headquarters

United States Marine Corps Correspondence Section, National Personnel Records Center,

the Military Archives Branch of the Commandant of the Marine Corps, the Marine Corps

History Division, and the National Archives in response to Swisher's requests. *Id*. at 2-3.

Those agencies forwarded "even tangentially related documentation." *Id*. at 3. Finally,

the Government argued that it was not required to respond further to the discovery

requests since the United States Marine Corps is not part of the "government" for

purposes of criminal prosecution.[4]  *Id.* at 3-4.  Swisher's counsel waived further briefing on the Motion to Compel.  *Reply to Resp.*, Dkt. 33.

The Court denied the third Motion to Continue the trial as well as the Motion to Compel finding that the Government had met its duties under Rule 16 and *Brady*.  *Mem. Dec. and Order*, Dkt. 41.  Just before trial, Groom associated with Dunlap.  *Notice of Association of Counsel*, Dkt. 45.

### C.    Trial

In resolution of the Government's Motion in Limine, the parties stipulated that no testimony or evidence would be presented at trial regarding Swisher's participation in the *Hinkson* trial or the nature of the charges therein.  *Second Motion in Limine*, Dkt. 25; *Stipulation*, Dkt. 50.

During the course of the trial itself, the parties stipulated that Woodring would have testified that he did not remember anything from the year 1957.  *Second Trial Stipulation*, Dkt. 59.  The trial lasted five days during which the Government called six witnesses and the defense called ten, including Swisher.  *Mins.*, Dkts. 55, 57, and 58.  The jury found Swisher guilty of all four counts of the Indictment.  *Special Verdict*, Dkt. 66.

### 3.    Post Trial and Sentencing

Approximately six weeks after the verdict, Swisher discharged Dunlap and Groom and retained Christopher Bugbee. *Notice of Substitution of Counsel*, Dkt. 67.  On

---

[4]  The Government noted that it had requested Swisher to provide the names of his Commanding Officers and those who served with him to verify his claims, but he had not done so.  *Id*. at 10.

Bugbee's motion, the Court continued the time for objecting to the Presentence Report and the sentencing itself. *Order*, Dkt. 69. After filing his objections, Bugbee moved for a new trial based on most of the same allegations that are contained in the § 2255 Motion. *Mot. for New Trial*, Dkt. 74. The Government contended, and the Court found, that Swisher's motion was untimely. *Mem. Dec. and Order*, Dkt. 85.

On January 5, 2009, the Court held a sentencing hearing at which it sustained Swisher's objection to the obstruction of justice enhancement recommended in the Presentence Report. The resulting total offense level of 15, with a criminal history category of I, yielded a guideline range of 15 to 21 months. The Court thereafter rejected the Probation Officer's and Swisher's recommendations of probation and sentenced Swisher to a term of imprisonment of 12 months and one day with a term of supervised release of three years to follow. *Judgment*, Dkt. 101. The Court imposed a below guideline sentence based on a balance between Swisher's myriad of health issues and the need for general deterrence. *Sent. Tr.* at 119-21.

**4.      Appeal and § 2255 Motion**

Swisher filed a timely Notice of Appeal (Dkt. 103). In the meantime, the parties litigated the restitution amount still owed to the VA which the Court had left open at the time of sentencing. The Court denied Swisher's Motion for Release Pending Appeal (Dkt. 95). *Order*, Dkt. 116. A few weeks later, Swisher filed the pending *pro se* § 2255 Motion which the Court stayed until either dismissal or resolution of the appeal. *Order*,

Dkt. 8.  The Court subsequently determined that the amount of restitution Swisher still

owed to the VA of the original $98,000 paid in benefits was $68,154.  *Restitution Order*,

Dkt. 131; *Am. J.*, Dkt. 135.

On appeal, Swisher argued that the Government's failure to timely disclose a

rebuttal witness denied him a fair trial, that the Court demonstrated bias by conveying a

negative view of defense counsel to the jury, that the appearance of one of his witnesses

by telephone violated his rights under the Confrontation Clause, that the cumulative effect

of errors warranted reversal, and that he received ineffective assistance of counsel.  The

Ninth Circuit rejected all except the ineffective assistance of counsel claim.  *United States*

*v. Swisher*, 360 Fed. Appx. 784 (9th Cir. 2009).  It declined to review this claim noting

that Swisher had raised the same claims in his then-stayed *pro se* § 2255 Motion.

## REVIEW OF § 2255 MOTION

**1.**     **Legal Standard**

**A.**     **28 U.S.C. § 2255**

Title 28 U.S.C. § 2255 provides four grounds under which a federal court may

grant relief to a federal prisoner who challenges the imposition or length of his or her

incarceration: (1) "that the sentence was imposed in violation of the Constitution or laws

of the United States;" (2) "that the court was without jurisdiction to impose such

sentence;" (3) "that the sentence was in excess of the maximum authorized by law;" and

(4) that the sentence is otherwise "subject to collateral attack."  28 U.S.C. § 2255(a).

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that a federal district court judge must dismiss a § 2255 motion "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief."

If the Court does not dismiss pursuant to Rule 4(b), the Court shall order the Government "to file an answer, motion, or other response within a fixed time, or to take other action the judge may order."

The Court may dismiss a § 2255 motion at other stages of the proceeding such as pursuant to a motion by respondent, after consideration of the answer and motion, or after consideration of the pleadings and an expanded record. *See* Advisory Committee Notes following Rule 8 of the Rules Governing Section 2254 Proceedings incorporated by reference into the Advisory Committee Notes following Rule 8 of the Rules Governing Section 2255 Proceedings.

If the Court does not dismiss the proceeding, the Court then proceeds to a determination under Rule 8 of whether an evidentiary hearing is required. The Court need not hold an evidentiary hearing if the issues can be conclusively decided on the basis of the evidence in the record. *See Frazer v. United States*, 18 F.3d 778, 781 (9th Cir. 1994).

### B.  Ineffective Assistance of Counsel

The well-established two-prong test for evaluating ineffective assistance of counsel claims is deficient performance and resulting prejudice. *See Strickland v.*

*Washington*, 466 U. S. 668 (1984).  Mere conclusory allegations are insufficient to state a claim of ineffective assistance of counsel.  *See Shah v. United States*, 878 F.2d 1156, 1161 (9th Cir. 1989).

In order to establish deficient performance, a defendant must show that counsel's performance "fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  Under the performance prong, there is a strong presumption that counsel's performance falls "within the wide range of reasonable professional assistance."  *Id*. at 689.  This is so because for the defendant, "[i]t is all too tempting . . . to second-guess counsel's assistance after conviction or adverse sentence. . . ."  *Id.*  For the court, "it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight."  *Bell v. Cone*, 535 U.S. 685, 702 (2002) (discussing *Strickland*).

In order to establish prejudice, a defendant must affirmatively prove by a reasonable degree of probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 694.  The *Strickland* standard is "highly demanding."  *Kimmelman v. Morrision,* 477 U.S. 365, 381-82; 386 (noting that the court should "assess counsel's overall performance throughout the case" when evaluating whether his assistance was reasonable).

Both prongs of the *Strickland* test must be met "before it can be said that a conviction (or sentence) 'resulted from a breakdown in the adversary process that render[ed] the result [of the proceeding] unreliable' and thus in violation of the Sixth

Amendment." *United States v. Thomas*, 417 F.3d 1053, 1056 (9th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687).

When the ineffective assistance of counsel claim is based on conflict of interest, however, a defendant need not demonstrate prejudice if he demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest adversely affected counsel's performance. *Cuyler v. Sullivan*, 466 U.S. 335, 350 (1980) (addressing a joint representation situation). However, the adverse effect element "remains a substantial hurdle" to relief. *Maiden v. Bunnell*, 35 F.3d 477, 481 (9th Cir. 1994).

The word "conflict" refers not to types of antagonistic relationships but rather to "legal conflicts of interest – an incompatibility between the interests of two of a lawyer's clients, or between the lawyer's own private interest and those of the client." *Plumlee v. Masto*, 512 F.3d 1204, 1210 (9th Cir. 2008) (en banc) (citation omitted) (rejecting subjective belief that counsel was not acting in his best interest as a basis for finding ineffective assistance of counsel). Stated another way, "'actual conflict' is a term of art defined by reference not to the nature of the alleged conflict itself, but to the effect of the conflict on the attorney's ability to advocate effectively." *United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (citing *Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002)).

The mere possibility of or speculation regarding a conflict of interest is not sufficient grounds for challenging a conviction. *Sullivan*, 446 U.S. at 350. *See also Williams v. Calderon*, 52 F.3d 1465 (9th Cir. 1995); *Sanders v. Ratelle*, 21 F.3d 1446,

1452 (9th Cir. 1994); *United States v. Allen*, 831 F.2d 1487, 1495 (9th Cir. 1987). If there

is only a possibility of conflict, *Strickland*'s performance and prejudice standard applies

and prejudice is not presumed. *United States v. Moore*, 159 F.3d 1154, 1157 (9th Cir.

1998).

## 2.     Analysis

The Court will discuss Swisher's conflict of interest claims first under *Sullivan* and

then under *Strickland*. It will then conduct a *Strickland* analysis of Swisher's remaining

ineffective assistance of counsel claims that are not alleged to have resulted from a

conflict of interest.

### A.      Conflict of Interest Claim and Relevant Facts

Swisher  contends that both Dunlap and Groom acted in Hinkson's interests, that

his (Swisher's) conviction led to Hinkson's being granted a new trial,[5] and that some of

counsel's decisions evidenced the conflict. Notably, Swisher was well aware that both

counsel had previously represented Hinkson. It is also apparent from the allegations in

his then pending civil suit that he was concerned at the time that Hinkson's father was

---

[5] At the time Swisher filed his § 2255 Motion, a Ninth Circuit panel had found that Hinkson was entitled to a new trial based on post-trial evidence establishing Swisher's "fabrications." *United States v. Hinkson*, 526 F.3d 1262, 1265 (9th Cir. 2008). Although the panel noted Swisher's indictment and conviction, like the district court, it "also [did] not consider them in reaching our decision today." *Id.* at 1277. However, on rehearing en banc, the Ninth Circuit held that the Court had not abused its discretion in denying Hinkson's motion for new trial based on what he claimed was newly discovered evidence that Swisher was not a combat veteran and in excluding evidence at trial that would have so indicated. *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009), reh'g denied and dissent vacated and superseded, 611 F.3d 1098 (9th Cir. 2010). Hinkson filed a petition for a writ of certiorari  on November 10, 2010, and the Government filed its response on March 7, 2011. *See Hinkson v. United States*, No. 10-869 (Sup. Ct. Nov. 10, 2010).

seeking to discredit him by spearheading investigations at the VA and the Marine Corps

League regarding his claims of valor.[6]  Nevertheless, Swisher sought to retain Groom,

subsequently retained Dunlap, and ultimately consented to retaining Groom as co-

counsel.

A chronological summary of Groom's and Dunlap's representation of Hinkson and

Swisher is necessary to an analysis of Swisher's conflict of interest claims.  Each attorney

has submitted an affidavit in support of the Government's Response to the § 2255

Motion.  Swisher did not submit an affidavit with his Reply controverting any statements

in those affidavits.

1. Groom and Dunlap were law partners between 1999-2000.  *Groom Aff.* ¶ 3.

2. 1999 – Groom introduced Swisher to Hinkson in his law office where both were clients. *Groom Aff.* ¶ 5.

3. 2001 – Groom represented Hinkson's father in a criminal case in Colorado.  *Groom Aff.* ¶ 4.

4. 2002 to November of 2003 – Groom represented Hinkson after he was arrested on federal tax charges until he withdrew from representation after Hinkson refused to speak with him or aid in his

---

[6] Swisher had sued over 40 individuals and entities – including Roland Hinkson and the Marine Corps League  –  as well as 20 John and Jane Does for defamation, and four federal agencies for violations of the Privacy Act arising out of an investigation into Swisher's claims about his past military service on his application for increased benefits and during testimony at the *Hinkson* trial.  *See Swisher v. Collins, et al.*, CV-06-338-S-EJL.  Visiting Judge Tena Campbell granted summary judgment in favor of the federal agencies, the Marine Corps League, Hinkson's attorney in the murder-for-hire case, and two other Defendants.  *Mem. Dec.*, Dkt. 251.  The Ninth Circuit recently affirmed the district court's decision.  *See Swisher v. Collins, et al.*, No. 09-35638,  2011 WL 130258 (9th Cir. Jan. 14, 2011).  The Court had previously granted the motions to dismiss of several of the other named Defendants.  *Mem. Dec. and Order*, Dkt. 156.

defense. Groom asked Dunlap to visit Hinkson in jail to see if he could resolve the communication issues. *Groom Aff.* ¶ 6.

5. September or October 2003 – Dunlap, at Groom's request, met with Hinkson in jail for approximately 45 minutes. He provided limited legal services to Hinkson. Within 60 days, a dispute arose and Dunlap ceased his involvement. He has had no contact with Hinkson since that time. *Dunlap Aff.* ¶¶ 4, 6. (A review of the docket in the tax case, *United States v. Hinkson*, CR-02-142-C-RCT reveals that Dunlap never formally appeared on Hinkson's behalf.)

6. 2004-2005 – Neither Dunlap nor Groom represented, consulted with, or in any way assisted Hinkson in the murder-for-hire case (Case No. CR-04-127-S-RCT) in which Swisher testified. *Groom Aff.* ¶ 7; *Dunlap Aff.* ¶ 7. (The Court also notes that neither counsel represented Hinkson on appeal.)

7. 2004 – Swisher contacted Groom regarding a civil lawsuit he wanted to file against the Marine Corps League, the VA, the VA-OIG, the Marine Corps, the Hinksons, and numerous other named and unnamed individuals. *Groom Aff.* ¶ 8.

8. 2004 – Groom advised Swisher that he could not represent him in the civil lawsuit because he had previously represented two of the parties Swisher intended to name – David and Roland Hinkson. Groom referred him to Dunlap. *Groom Aff.* ¶ 9.

9. 2005 – Swisher contacted Dunlap regarding the civil lawsuit referred to above at Groom's suggestion. Dunlap advised that he would be willing to consult but not be attorney of record. *Dunlap Aff.* ¶¶ 8, 9. (The Court notes that Swisher appeared *pro se* in that civil suit, CV-06-338-S-EJL.)

10. Dunlap advised Swisher that he had met with Hinkson once in his criminal tax case for about 45 minutes. Because Hinkson had refused to pay for his services, Dunlap did no further work for him. Swisher was not concerned about the prior representation and requested that Dunlap continue to assist him in the civil case. *Dunlap Aff.* ¶ 10.

11.    Swisher discussed his belief that he was being "persecuted" by
       Hinkson and his family in revenge for testifying against Hinkson in
       the murder-for-hire case and his belief that they were behind the VA
       investigation into his eligibility for benefits.  *Dunlap Aff.* ¶ 11.

12.    2005 – Groom continued to assist Swisher "in his struggle with the
       VA to obtain additional benefits related to his reported combat
       experiences."  Groom signed two affidavits in support of Swisher.
       *Groom Aff.* ¶ 10.

13.    2005 – Groom's first affidavit submitted to the VA explained that
       Swisher had brought an envelope to his office for safekeeping that
       contained what appeared to be an original letter from Woodring to
       Swisher with a carbon copy of a replacement DD-214 signed by
       Woodring.  *Groom Aff.* ¶ 11.  However, he had not seen the
       documents since sometime after March of 2005.  *Id.*  The second
       affidavit responded to affidavits submitted by the "Hinkson defense
       team" from Woodring and Miller challenging the veracity of
       Swisher's combat story.  *Groom Aff.* ¶ 13.

14.    April 2006 – Groom authored a letter of introduction to prospective
       counsel for Swisher after Swisher again stated following his
       testimony in the murder-for-hire case that he wished to file the
       lawsuit referred to above.  Groom told him just as he had in 2004,
       that he could not represent him because he had previously
       represented the Hinksons whom Swisher had intended to name as
       defendants.  *Groom Aff.* ¶ 14.

15.    August of 2007 – After Swisher's indictment, Groom referred him to
       Dunlap again because of Dunlap's criminal defense experience and
       because Groom was no longer living in Idaho.  *Groom Aff.* ¶ 15.

16.    August of 2007 – Dunlap met with Swisher to discuss potential
       terms of representation in the criminal matter.  Dunlap advised
       Swisher that he was considered one of five good criminal defense
       attorneys in the Magic Valley area.  *Dunlap Aff.* ¶¶ 12, 13.

17.    August of 2007 – Swisher agreed that Groom would act as co-
       counsel in trial preparation because of the number of documents and
       expected legal issues.  *Groom Aff.* ¶ 16; *Dunlap Aff.* ¶ 14.  However,

it was undecided until shortly before trial whether Groom would testify or act as co-trial counsel. *Groom Aff.* ¶ 16; *Dunlap Aff.* ¶ 16.

### (1)    Conflict of Interest

The above chronology derived from counsel's unrebutted affidavits demonstrates that neither Groom nor Dunlap had represented Hinkson since 2003. Swisher was indicted in 2007. Therefore, the Court is presented with a case of successive representation rather than concurrent representation. Although the Supreme Court has left open the question of whether a showing a prejudice is required in successive representation cases, the Ninth Circuit has held that prejudice is presumed in certain cases of successive representation. *See Houston v. Schomig*, 533 F.3d 1076, 1081 (9th Cir. 2008) (citations omitted).

In cases of successive representation, it is more difficult to demonstrate that counsel actively represented conflicting interests. *Sanders*, 21 F.3d at 1453. A different standard applies. *Id.* Conflicts may arise in successive representation cases "if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir. 1988) (citations omitted) (finding no actual conflict where counsel represented first client in an arraignment in an unrelated case and in the current case only in an arraignment and lineup that did not involve any privileged communication). *See also Schomig*, 533 F.3d at 1081 (noting conflicts can arise from successive representation particularly when there is a substantial relationship between the cases involving similar or

related factual contexts).

Applying the *Mannhalt* and *Schomig* standards, it is obvious that Swisher's case was factually unrelated to Hinkson's tax case, and there is no indication that counsel divulged any of Hinkson's privileged communications or needed to do so to defend Swisher.  Less obvious is whether counsel "otherwise" divided their loyalties.  Swisher, of course, believes that they did so in order to assist the Hinkson family in their quest to secure a reversal of Hinkson's conviction.  As shown below, however, even if the Court were to assume that counsel's loyalties were divided, Swisher has not shown a resulting adverse effect on their representation resulting in an actual conflict of interest.  *Mickens v. Taylor*, 535 U.S. 162, 171, 172 n.5 (2002) (actual conflict of interest is not separate and apart from adverse effect).

### (2)    Adverse Effect

The "adverse effect in the *Cuyler* [*Sullivan*] sense must be one that significantly worsens counsel's representation of a client."  *United States v. Mett*, 65 F.3d 1531, 1535 (9th Cir. 1995).[7]  A conflict that causes some problems with the attorney-client relationship, such as "transient feelings of mistrust," but has no significant effect on representation is not an "adverse effect" in the *Cuyler* [*Sullivan*] sense.  *Id.* at 1535-36.

To establish an adverse effect, a defendant must show that his attorney chose "between possible alternative courses of action that impermissibly favored an interest in

---

[7]  Some courts refer to *Cuyler v. Sullivan* as *Cuyler* and some as *Sullivan*.  The Supreme Court refers to it as *Sullivan*.  *See, e.g., Mickens v. Taylor*, 535 U.S. 162 (2002).

competition with those of his client."  *Washington v. Lampert*, 422 F.3d 864, 873 (9th

Cir. 2005).  Stated another way, he must demonstrate "that some plausible alternative

defense strategy or tactic might have been pursued but was not and that the alternative

defense was inherently in conflict with or not undertaken due to the attorney's other

loyalties or interests."  *United States v. Wells*, 394 F.3d 725, 733 (9th cir. 2005) (internal

quotation marks omitted).

    As the Eighth Circuit recently explained,

> The effect must be actual and demonstrable, causing the
> attorney to choose to engage or not to engage in particular
> conduct.  To make such a showing, the defendant must
> "identify a plausible alternative defense strategy or tactic that
> defense counsel might have pursued, show that the alternative
> strategy was objectively reasonable under the facts of the
> case, and establish that the defense counsel's failure to pursue
> that strategy or tactic was linked to the actual conflict."

*Noe v. United States*, 601 F.3d 784, 790 (8th Cir. 2010) (citations omitted).

    In determining whether a defendant has made the requisite showing, "the court

itself must examine the record to discern whether the attorney's behavior seems to have

been influenced by the suggested conflict."  *Sanders*, 21 F.3d at 1452.

    An examination of the record as dictated by *Sanders* reveals no decisions

influenced by any conflict with the Hinksons.  To the contrary, Swisher has not advanced

any plausible alternative strategies that were objectively reasonable under the

circumstances of this case.

    Swisher contends that counsel's conflict adversely affected their performance in

several ways most notably as evidenced by the following:

1.     Denial of right to testify and threat to abandon if he did so.

2.     Withholding of evidence which would have resulted in acquittal such as Groom's testimony, affidavits about the original documents, and stipulating that Woodring not be called.

3.     Groom's refusal to testify on his behalf although he testified as a defense witness for Hinkson.

4.     Seating a special forces soldier on the jury over his objection.

If Swisher cannot show that counsel's decisions were influenced by or linked to the alleged conflict, then the claims must be analyzed under the *Strickland* standard.

### (a)     Denial of Right to Testify and Threat to Abandon

Swisher contends that counsel denied him his right to testify regarding his military experiences and threatened to "walk out" on him if he attempted to testify.  He submitted a copy of each counsel's retainer agreement containing a clause that stated, "Refusal by the Client to follow the Attorney's advice is ground for the Attorney's immediate withdrawal." *2255 Mot.,* Exs. 1 and 2, Dkts. 119-2 and 119-3.  He also submitted affidavits from various individuals stating that when Swisher told Dunlap in their presence that he should testify (either because valuable evidence was not being shown to the jury or that only he knew exactly what happened), Dunlap stated that he and Groom would "walk" or be "gone."  *Id*. Ex. 3,4, 5, and 6, Dkts. 119-4 to 119-7.  *See also Swisher Affidavit* (filed with Motion for New trial), Dkt. 74-8.

While admitting that the provisions appeared in their retainer agreements, Groom

explained that he includes the language for use when a client refuses to cooperate in the preparation of a defense and then objects to his request to withdraw.  *Groom Aff.* ¶ 18. However, he denied ever threatening to walk out.  *Id.*  Dunlap also denied telling Swisher that he could not testify or telling him that he would "walk" if Swisher did so.  *Dunlap Aff.*  ¶¶ 39, 40.

Despite the conflicting affidavits, the Court does not deem it necessary to hold an evidentiary hearing because ultimately, whether counsel threatened to walk or not, Swisher had an opportunity to place his concerns before the Court and did not do so.

A defendant's constitutional right to testify in his own behalf is implicit in the Fifth, Sixth, and Fourteenth Amendments.  *Rock v. Arkansas*, 483 U.S. 44, 51-53 (1987). However, "[w]hether the defendant is to testify is an important tactical decision as well as a matter of constitutional right."  *Brooks v. Tennessee*, 406 U.S. 605, 612 (1972). "Although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify."  *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993).  A defendant's "silence" after his attorney decides not to call him as a witness implies that he has waived the right to testify on his own behalf.  *See United States v. Pino-Noriega*, 189 F.3d 1089, 1095 (9th Cir.) *cert. denied*, 528 U.S. 989 (1999).

As noted in *Pino-Noriega*, the failure to testify should "not be raised as an afterthought after conviction."  *Id.* at 1096.  Rather,

[a] defendant who wants to reject his attorney's advice and take the stand may do so "by insisting on testifying, speaking to the court, or discharging his lawyer." When a defendant remains "silent in the face of his attorney's decision not to call him as a witness," he waives the right to testify.

*Id*. at 1094-95 (internal citations omitted).  By extension, this rationale would apply to situations where, as here, counsel limits a defendant's testimony for tactical reasons.

The Court not only presided over the trial but also over the sentencing.  It was quite clear that Swisher is not one easily intimidated.  He is an educated, articulate, sophisticated individual who was quite capable of speaking up and advising the Court of his wish to testify more fully.  Indeed, his allocution at sentencing in arguing for a sentence of probation covered almost twenty pages of the transcript.  *Sent. Tr.* 87-106.  Swisher also advocated for himself after sentencing, albeit unsuccessfully, by filing a motion to postpone his incarceration and again after he was incarcerated by filing an emergency motion for home detention or proper medical care.  *See Mot. for Temporary Postponement*, Dkt. 120 and  *Emergency Mot.*, Dkt. 132.  Therefore, the Court finds that Swisher waived his right to testify fully.  However, it will address the conflict of interest and ineffective assistance of counsel claims.

To demonstrate an adverse effect based on allegedly preventing him from testifying fully, Swisher must show not only that counsel wanted to assist the Hinksons but also that there was a causal relationship between that desire and the decision to limit Swisher's testimony.  *See, e.g., Reyes-Vejerano v. United States*, 276 F.3d 94, 99 (1st Cir.

2002) (stating defendant must show some causal relationship between the attorney's awareness of the government's investigation of him and the attorney's failure to put defendant on the stand to prevail on conflict of interest claim). Stated another way, he must show that limiting his testimony "impermissibly favored" Hinkson. *See Washington*, 422 F.3d at 873. This he has not done.

Groom had a lengthy relationship representing Swisher, "knew he would have a hard time staying on track during his direct testimony," and "was concerned about what would be permitted on cross examination if direct examination was not limited." *Groom Aff.* ¶ 35. Dunlap "suggested that we narrow his direct testimony to the interactions with Woodring and why his records would be missing or sanitized." *Id.* Dunlap had similar reservations about Swisher's ability to stay on track and about the risk of cross examination if direct was not limited. *Dunlap Aff.* ¶ 35. In addition, Dunlap was concerned that Swisher might perjure himself. *Id.* ¶ 36. Despite their concerns, counsel made it clear that it was Swisher's choice to go along with their recommendation to limit his testimony or not. *Id.*

Given the nature of the charges, the concerns expressed by counsel, and the Court's own observation of Swisher, the Court cannot find that counsel's decision to limit Swisher's testimony was influenced by their desire to assist Hinkson. Rather, Swisher only presents an unsubstantiated theory of loyalty to Hinkson. *See Reyes-Vejerano*, 276 F.3d at 99 (noting even if attorney had been under investigation, the defendant offered no

reason to think the attorney was influenced in his strategy "other than the general and unspecified theory that [the attorney] must have wanted to please the government").

Counsel's decision to limit Swisher's testimony appears to be the result of sound strategy rather than a ruse to ensure a guilty verdict to aid Hinkson in securing a new trial. In fact, when sustaining Swisher's objection to the obstruction of justice enhancement at sentencing, the Court commented favorably on trial counsel's limiting Swisher's testimony to avoid exposing him to an opportunity to perjure himself. *See Sent. Tr.* at 11 ("Defense counsel was very careful not to ask him any questions that might have put him in that posture . . ." referring to risking an obstruction of justice enhancement).[8]

Carrying Swisher's argument to its logical conclusion, the more plausible alternative for aiding Hinkson would have been to allow Swisher to testify fully. A guilty plea would have been even more helpful to the alleged cause, but there is no indication that counsel pressured Swisher to plead guilty. Rather they supported Swisher's desire to go to trial, but did so in the way they deemed most likely to secure acquittal. *Id.* (finding no adverse impact based on attorney's advising the defendant not to testify where record and evidence showed that his intended testimony was at odds with the defense of actual innocence and counsel did not pressure him to plead guilty). Swisher has simply not shown that his testifying about his military experiences was a plausible alternative to the tactic suggested by counsel.

---

[8] The Court also notes that at sentencing Bugbee admonished Swisher after his lengthy allocution on the issue of his disability rating that he had "said enough." Tr. at 108.

Swisher's claim fails even under the traditional *Strickland* approach.  Swisher assumes – in spite of the overwhelming evidence that his story was fabricated – that he would have been acquitted had he testified about "the full story."  Not only is that entirely speculative, counsel's strategy, though unsuccessful in securing an acquittal, was the result of "reasonable professional judgment" in light of their well-founded concerns about his ability to stay on track and to avoid perjury.[9]  *Strickland*, 466 U.S. at 699.

The Ninth Circuit has rejected similar claims on a number of occasions.  For example, in *Matylinsky v. Budge*, 577 F.3d 1083 (9th Cir. 2009), the defendant, on trial for killing his wife, had argued that counsel prevented him from testifying to demonstrate to the jury that his actions were neither premeditated nor deliberate.  The court agreed with the state court that counsel's decision to not put him on the stand was reasonable because the defendant would have been subjected to "damning cross-examination on his prior convictions" and the jury "would have witnessed his matter-of-fact delivery regarding his wife's death and general disinterested nature" and his testimony was inconsistent with the theory of the case.  *Id*. at 1097-98.  Of note, the court also stated that to the extent counsel may have infringed on the defendant's right to testify, there was no indication of prejudice.  *Id*. at 1098.

Similarly, in *Medley v. Runnels*, 506 F.3d 857 (9th Cir. 2007), the defendant had

---

[9]  Counsel's defense strategy was to focus on weaknesses in the Government's case by questioning the accuracy of the military records, rebutting the Government's expert's testimony regarding whether the replacement DD-214 was a forgery, suggesting Woodring's motive for revenge, and submitting letters from Swisher to his family written while he was in Japan.

wanted to testify that he killed the victim in self-defense. Counsel recommended against testifying because of the defendant's prior convictions, his inconsistent statements during a lengthy interview with police, and the inconsistency with the defense theory that someone else killed the victim. Noting those factors plus the "more than sufficient" other evidence to convict the defendant, the Ninth Circuit found that the inability to testify was not prejudicial.

Finally, in *Dows v. Wood*, 211 F.3d 480 (9th Cir. 2000), the defendant claimed ineffective assistance of counsel where counsel threatened to walk out on him if he testified. The district court had noted that the defendant had never indicated during the trial that he wanted to testify or that counsel prevented him for doing so. The Ninth Circuit found that counsel had very good reason for suggesting that the defendant not testify because of the risk of impeachment based on three prior convictions. *Id.* at 487.

Counsel here state that Swisher agreed with the decision to limit his testimony despite his current claims. Although not necessary to the Court's decision here, the Court notes that the totality of the circumstances suggests that Swisher was "persuaded" and not "coerced" into limiting his testimony:

> Travis contends that his counsel was ineffective because he refused to accept Travis's decision to testify. Based on the events just recited, though, it is evident that Travis was aware of his right to testify and that, after the overnight recess, the opportunity to consult with his family, and his competency exam, he did not invoke that right. Travis's comments at trial indicate that he was a vocal defendant who did not hesitate to express his opinions. Given Travis's character, his failure to

> reassert his right to testify after the overnight recess was more
> than likely a product of his counsel's persuasion, not his
> coercion. Travis has not proved that his attorney's
> performance was constitutionally deficient.

*United States v. Brown*, 217 F.3d 247, 259 (5th Cir. 2000), vacated on unrelated grounds

under the name *Randle v. United States*, 531 U.S. 1136 (2001). *See also, Emery*, 139

F.3d 191, 199 (5th Cir. 1997) (finding that because the defendant was "strong-willed and

unlikely to allow his decisions to be controlled by pressure from others," his decision not

to testify indicated the operation of counsel's persuasion, not his coercion). Here, on

direct examination, Swisher appeared to stay on track suggesting his acquiescence to the

strategy recommended by counsel. Tr. 581-87.

### (b)    Withholding of Key Evidence and Testimony

Among the testimony allegedly withheld out of loyalty to Hinkson, Swisher refers

to the stipulation entered into without his consent that Woodring would have testified that

he did not remember anything from 1957. However, Swisher obviously knew of the

problems with calling Woodring as a witness.[10] *See also Dunlap Aff. ¶* 21 and *Groom Aff.*

*¶* 21.[11] It is obvious that Swisher's suggested alternative of calling Woodring as a witness

---

[10] According to Swisher's Complaint in his civil suit, Col. Woodring had been contacted during an investigation of Swisher's medal claims by the Marine Corps League. He had apparently said at one point that his signature must have been superimposed on the challenged documents. He later stated that he did not recall anything from calendar year 1957 and did not realize he signed two DD-214s and other documents. *Complaint*, *Swisher v. Collins, et al*, CV-06-338-S-EJL, at ¶¶ 138-139, Dkt. 1.

[11] The affidavits state as follows: "One of the issues discussed at length with Mr. Swisher was how the defense team would handle the issues surrounding retired Colonel Woodring. [Both counsel] discussed at length with Mr. Swisher the potential pitfalls of calling Woodring as a witness. Woodring provided a signed affidavit to attorney Wesley Hoyt which stated he never authorized, signed or approved

despite his inability to recall and his possible antagonistic attitude was not an objectively reasonable alternative strategy.

Swisher next contends that the "original" replacement DD-214 (a carbon copy with an original signature) and the accompanying Woodring letter "disappeared" from Groom's office shortly before trial. Groom admits in his affidavit that the originals of the replacement DD-214 and Woodring letter had been in his office (although he denies he ever had a safe there as claimed by Swisher), but states that Swisher and his wife would periodically come into his office and take the documents. *Groom Aff.* ¶ 11. He does not believe they were returned once the Swishers took them on one occasion in the spring of 2005. *Id.*

Swisher would have the Court believe that simply because the documents were not in Groom's office, Groom deliberately withheld them out of loyalty to Hinkson. Without more, the Court cannot so find. Had Groom wanted to sabotage the defense, it is unlikely that he would have assisted Swisher in getting the PTSD benefits in the first place.

In light of the unavailability of the originals, Swisher "demanded" that prior affidavits and letters that Groom had submitted to the VA in support of Swisher's claim be admitted into evidence. *§ 2255 Mot.*, Exs. 10-12. He understood that because Groom

---

a second DD-214 for Mr. Swisher. A transcript of a call with a Marine Corps League investigator indicates Woodring had no memory of Mr. Swisher, that it was not his job to sign DD-214s, that he was not a personnel officer and that the medals on the second DD-214 did not exist at the time Mr. Swisher left the Marine Corps. Additionally, we were informed that during the last contact with Col Woodring he was upset and stated he didn't remember anything from 1957 and wanted to be left alone."

could not testify while acting as counsel, Dunlap would cross examine a prosecution witness about the affidavits and letters. However, Dunlap never did.

Dunlap denies that he told Swisher that Groom's affidavits would be entered into evidence. *Dunlap Aff.* ¶ 30. Groom likewise denies that he told Swisher they would be introduced. *Groom Aff.* ¶ 30. He further states that both Swisher and his wife assisted in the preparation and assembling of the exhibit packages and therefore knew that Groom's affidavits would not be offered. *Dunlap Aff.* ¶ 30. Whether or not counsel told Swisher the documents would be submitted, they would not have been admissible under the Federal Rules of Evidence. Therefore, Swisher has not demonstrated that counsel failed to follow a plausible alternative course of action.

Swisher's claim would fail under *Strickland* as well because he cannot show prejudice. That the availability of the "originals" of those documents – or Groom's affidavits or testimony regarding them – would have helped Swisher in his defense is purely speculative given the questions raised by the Government's witnesses as well as the fact that there was nothing in his file to indicate that he had participated in the secret mission, been wounded, or received medals or commendations for his participation. Tr. 68-86 (Hensen); Tr. 313-14; 320 (Shattuck). Not only were the signatures at issue, but also the letterhead and various other characteristics of the documents suggested that they were not authentic.[12] Furthermore, the Marine Corps records indicate that all documents

---

[12] Jeffrey Shattuck, a former Marine who had extensive military and civilian experience working with Marine Corps personnel files and health records, testified about several anomalies with the

from the Korean War Era had been declassified and that no such mission occurred at all. Finally, Lt. Col. Elaine M. Hensen, Assistant Head for the Military Awards Branch at Headquarters Marine Corps, testified about the "endorsement chain" for military awards once an award is recommended. Tr. 71. Even though a paper copy of the documentation is kept at every level of the endorsement chain, she could not locate any such documentation for Swisher.[13] Tr. 72.

Given that the originals of the replacement DD-214 and accompanying Woodring letter were for whatever reason unavailable, the Court looks to the manner in which counsel attempted to prove the authenticity of the copies of those documents. Counsel called a forensic document and handwriting expert, Travis King, as a witness. They called Patricia Bromund, Swisher's parents' caretaker from 1999 to 2002, who testified that Mrs. Swisher showed her several medals and citations with Swisher's name on them.

---

replacement DD-214 and the accompanying Woodring letter dated October 16, 1957. *See, generally*, Tr. 242-344. Specifically regarding the letter, Shattuck testified that it does not follow Naval correspondence procedures, appears to be written as a business-type letter, omits certain information, and is written on stationery that appears to be unofficial. Tr. 306-08. Specifically regarding the replacement DD-214, Shattuck testified that certain remarks in the remarks section at the bottom are not authorized statements according to the separation manual for that time period, that "signature on file" is not an appropriate comment where a signature is not present, and that Woodring would not have had Swisher's service record in his possession at the time the replacement DD-214 was issued. Tr. 308-18. In addition, he testified that a DD-214 is corrected by issuance of a DD-215, not by issuance of a replacement DD-214. Tr. 250. Finally, Shattuck testified that copies of the letter and the replacement DD-214 could not be located anywhere in the military files despite the fact that the DD-214 is a seven-part form. Tr. 309; 318; 319-20.

[13] Hensen also testified that the same process applies when an individual is recommended based on service in a classified, secret, or top secret mission. Tr. 73. Both she and Shattuck testified that an unclassified version of the recommendation and citation would be in the official military personnel file. Tr. 73 (Hensen); Tr. 314 (Shattuck).

Tr. 436. She was familiar with military medals because her husband had received some. Tr. 436-37. Bromund specifically recalled seeing a citation with the embossment of the Purple Heart and a certificate for the Silver Star. Tr. 437-38. She last saw the items spread out on Mrs. Swisher's bed in late 1999. *Id.* She theorized that the items may have been stolen by another caretaker after they were boxed up with other items and stored in the garage. Tr. 438-39.

Counsel's attempts to establish authenticity were reasonable under the circumstances notwithstanding the fact that the jury apparently was not persuaded by the testimony. Therefore, Swisher cannot show deficient performance or prejudice.

### (c) Groom's Refusal to Testify

Swisher alleges that because Groom testified for Hinkson in Hinkson's trial but not in his trial, Groom must have favored Hinkson. Even if the Court were to find that Groom refused to testify out of loyalty to Hinkson, the Court cannot find adverse effect since Groom's testifying at Swisher's trial was not a viable option or plausible alternative.[14]

As stated above, even though Groom could have testified that he had seen the so-called originals, he could not have authenticated the documents or the signatures. *Groom*

---

[14] Groom's affidavit states that he testified as a government witness in the Hinkson case. *Groom Aff.* ¶ 7. The Court notes, however, that the minutes of Day Ten of the trial list Groom as a *defense* witness. *Min.*, Dkt. 182, Case No. CR-04-127-S-RCT. The Court is unaware of the nature of Groom's testimony because the transcript of that day's testimony has been archived and is not immediately available to the Court. However, the Court does not deem it necessary to retrieve it given its findings on this issue.

*Aff.* ¶ 28. Although Groom seemingly represented himself to be an expert in his affidavits presented to the VA, he would not have been qualified as an expert in a court of law. He is clearly not a handwriting or document expert. Groom was merely expressing what, in effect, was a lay opinion based on his own time in the military service. Neither his testimony on supposed authenticity nor the affidavits themselves would have been admitted into evidence.

For the same reasons, Defendant cannot show ineffective assistance of counsel and resulting prejudice under *Strickland*. Groom could have testified only that he had seen the documents and that the letter appeared to bear an original signature. Given the overwhelming testimony regarding other questionable features of the documents, it is not likely that Groom's testimony would have changed the outcome of the trial.

According to Groom and Dunlap, Swisher concurred with the strategic decision to use Groom as trial counsel rather than as a cumulative witness. However, whether Swisher concurred or not, deciding which witnesses to call is one of those strategic decisions that are given great deference in a § 2255 proceeding. "Few decisions a lawyer makes draw so heavily on professional judgment as whether or not to proffer a witness at trial." *Lord v. Wood*, 184 F.3d 1083, 1095 (9th Cir. 1999).

### (d)     Seating Special Forces Juror

With regard to Swisher's claim that counsel seated a special forces soldier on the jury over his objection, the Court notes that Swisher is essentially stating that counsel

must have seated the special forces soldier because they wanted Swisher to be convicted so Hinkson would get a new trial.  Dunlap and Groom stated that Swisher had specifically indicated (1) that he wanted jurors with prior military experience, including "Special Forces" who would support the defense theory that the military either lost his records or intentionally covered up his combat experience; and (2) that he was "ecstatic about the jury that was chosen." *Groom Aff.* ¶¶ 32-33; *Dunlap Aff.* ¶¶ 32-33.  Swisher's only reply to the statements in counsel's affidavits is that he did not wish to have an Army Special Forces individual on his jury "because of the long term service animosity with Marines." *Reply* at 13, Dkt. 13 in civil case.

Whether or not Swisher wanted that particular juror selected, the Court cannot say that counsel's strategic choice is indicative of an adverse effect induced by a conflict of interest.  Aside from the generalized perception of animosity between the services, Swisher has not alleged that the juror exhibited any specific bias against him during *voir dire* or that he otherwise was an unsuitable choice.  The Court cannot infer an adverse effect based on this lack of evidence.  *See United States v. Mett*, 65 F.3d 1531, 1535 (9th Cir. 1995) (absent evidence that counsel did anything wrong in selecting the jury, court cannot infer that it is likely that his performance in jury selection was adversely affected by the alleged conflict of interest).

Likewise, there is no basis for finding either deficient performance or prejudice under *Strickland*.  "An attorney's actions during *voir dire* are considered to be matters of

trial strategy . . . .  A strategic decision cannot be the basis for a claim of ineffective

assistance unless counsel's decision is shown to be so ill-chosen that it permeates the

entire trial with obvious unfairness."  *Miller v. Webb*, 385 F.3d 666, 672-73 (6th Cir.

2004) (internal citation omitted).

Because Swisher makes no credible claim that the Special Forces juror himself

harbored any bias or was otherwise unsuitable, there is no basis for finding that counsel's

failure to strike that juror was deficient.  The strategy advanced by counsel that the

Special Forces juror might be sympathetic to the defense theory that the military either

lost his records or intentionally covered up his combat experience appears to be

reasonable in the absence of any indication of specific bias.  Furthermore, the likelihood

that the presence of the Special Forces juror changed the outcome of the trial is entirely

speculative.

### B.  Ineffective Assistance of Counsel Unrelated to Conflict of Interest

*Strickland* directs the Court to "eliminate the distorting effects of hindsight" to the

extent possible and to evaluate the challenged conduct "from counsel's perspective at the

time."  *Strickland*, 466 U.S. at 690.  Recognizing the difficulty of doing so, *Strickland*

explained further:

> [A] court must indulge a strong presumption that counsel's
> conduct falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged
> action "might be considered *sound trial strategy*." There are
> countless ways to provide effective assistance in any given

case.  Even the best criminal defense attorneys would not
defend a particular client in the same way.

*Id*. (citations omitted) (emphasis added).

As shown below, most of the acts and omissions of which Swisher complains are
the result of strategic decisions generally left to counsel and not to the demands of a
client.  Furthermore, a difference of opinion regarding trial tactics is not proof of
ineffective assistance of counsel.  *See Cox v. Ayers*, 613 F.3d 883, 893 (9th Cir. 2010)
(citing *United States v. Mayo*, 646 F.3d 369, 375 (9th Cir. 1981) (per curiam)).

### (1)    Withholding Evidence

In Ground Five of the § 2255 Motion, Swisher lists numerous documents and
witnesses counsel failed to introduce that allegedly would have resulted in acquittal if
admitted.  As the Government points out in its Response and a review of the record
confirms, many of the witnesses did testify and many of the documents were admitted.[15]
*Resp.* at 18-19.  Others would have clearly been inadmissible, irrelevant, or cumulative of
other evidence.  *Id*.

Contrary to Swisher's allegations, Travis King was permitted to discuss the use of
Photo Shop, James Funke testified regarding his experience with individuals who attempt

___

[15]  These individuals may not have testified regarding every issue Swisher believes was relevant.
However, they did testify and their entire testimony is set forth in the trial transcript at the noted pages:
Travis King (Tr. 518-62); Paul Nicholia (Tr. 511-17); James Funke (Tr. 456-99); Doug Sellars (Tr. 409-
20); and Esther Westlake (Tr. 500-10).  Furthermore, certain evidence was introduced that Swisher
implies was not.  *E.g.*, letters Swisher wrote home at the time of the "special operations."  *See* Def.'s Exs.
2025-37.  Other evidence, counsel attempted to introduce but the Court sustained the Government's
objection to its introduction.  *E.g.*, the satellite photos Mr. Sellars obtained from the internet.  *See* Tr. 415-
18.

to fake PTSD, Doug Sellars testified about the changes he observed in Swisher after Swisher returned from the military, and Esther Westlake testified about Swisher's disability rating. *See* Tr. 553-54; 468-69; 409; 502-05. Other witnesses and evidence were either cumulative or of little relevance to the time period in which Swisher served. In any event, Swisher has not persuaded the Court that any failure to call certain listed witnesses and to introduce certain evidence constitutes deficient performance.

### (2)      Failure to Investigate or Subpoena Documents

Swisher contends that counsel should have further investigated and subpoenaed the numerous documents listed in his discovery motion and § 2255 Motion.

> *Strickland* counsels that attorneys have a "duty to make reasonable investigations" regarding whether admissible evidence exists. In evaluating attorneys' judgments as to whether to pursue evidence, courts must consider "whether the known evidence would lead a reasonable attorney to investigate further." We apply a "heavy measure of deference to [an attorney's] judgments" as to whether additional evidence may be adduced by further investigation. As the district court said, "[i]f the decision not to investigate beyond a certain point is reasonable, then the failure to do so cannot constitute ineffective assistance of counsel."

*Stenson v. Lambert*, 504 F.3d 873, 889 (9th Cir. 2007) (internal citations omitted).

Here, counsel received discovery from the Government which contained Swisher's entire military file, medical file, and other correspondence from the military. Those files contained no hint that there was a secret mission; that Swisher participated and was wounded in the mission; or that he received any medals, commendations, or other

recognition.  Furthermore, the unit diaries and other records did not reveal that Swisher's

Company or anyone from his Company had engaged in any missions or battles or been

injured or killed during the time Swisher was on active duty.  Letters from Marine Corps

record custodians that there was no secret mission, that information regarding General

Erskine for 1955 pertaining to Korea did not exist,[16] and that no medical or other record

existed supporting his claims suggests the futility of further investigation.  Even Swisher

himself states only that the documents "may" support his claims.[17] The Court finds that

the decision not to investigate further was thus reasonable under the circumstances

especially given that Swisher's service in Japan occurred over fifty years before trial.[18]

Furthermore, testimony at trial indicates that he was not prejudiced even if counsel should

have subpoenaed documents.[19]

---

[16] Swisher states that General Erskine was the Assistant Secretary of Defense in Special Operations under Presidents Eisenhower and Kennedy and was in charge of the special classified operation in which he participated.  *Mem. in Supp. of Mot. to Permit Disc.* at 5, Dkt. 14-1 in civil case. Submitted with Swisher's Discovery Memorandum are two letters illustrating the futility of requesting records pertaining to General Erskine.  *See Disc. Mem.*, Exs. 4 and 6.

[17] Although it is unclear whether counsel had available to them the June 25, 2004 letter from the Head of the Records Correspondence Section of the Personnel Management Support Branch submitted in the civil case, the Court notes that the letter transmitting Swisher's unit diary and medical records states that a search had been done of the hospital records on file at the National Personnel Records Center and they did not reveal any injury in 1955.

[18] For example, the Court notes that Swisher wanted documents from  hospital and the Middle Camp Fuji in Japan.  However, the likelihood that they would retain documents at their local facilities for over 50 years is remote.  Indeed, Navy hospital records are retired every two years to the NPRC(MPR). *See* http://www.archives.gov/st-louis/military-personnel/public/active-duty-medical-records.html.

[19] Testimony at trial demonstrates the futility of subpoenaing several of the requested documents. *E.g.*, Annette Amerson, Program Manager for the Unit Lineage and Honors Program  researched the unit lineage (history of a unit's medal honors) of Swisher's unit, Golf Company, Third Battalion, Third Marines, Third Marine Division (the "333"), during 1955 to 1956.  She found no indication that the 333

### (3)     Comments Made in Jest.

Swisher alleges in Ground Seven that Dunlap made comments in jest during the opening statement, during examination of a Marine Corps Major, and in the closing argument to the effect that Swisher was the "most intelligent" person he had met who had been planning to defraud the government for over 50 years. *§ 2255 Motion* at 12. He reasons that because no one laughed or took it as a joke, the jury believed Dunlap. Therefore, Dunlap "intentionally aided the prosecution" because the comments elicited bias against him "as no one likes a 'most intelligent' person." *Id*. 12-13.

The Court has reviewed defense counsel's opening statement and finds no comment about sitting next to the "most intelligent" person. Tr. 62-67. Swisher has not identified the "Marine Corps Major" during whose testimony Dunlap allegedly made a similar comment. The Court will not search the record looking for the context of a comment made by an unidentified witness. A review of defense counsel's closing argument, however, does reveal such a comment. After thanking the jurors at the start of his closing argument, defense counsel stated:

---

had engaged in any combat at all between World War II and the Viet Nam War or that the unit had had a mission into North Korea in 1955. Tr. 345-50. Lt. Col. Elaine M. Hensen, Assistant Head for the Military Awards Branch at Headquarters Marine Corps, testified that there was no support for Swisher's claim that he was awarded any citations or awards or medals, that no expeditionary medals were issued from 1955 to 1957, that the unit diaries did not reveal any top-secret missions, injuries, or deaths. Tr. 345-53. Jeffrey Shattuck, Head of the Records Correspondence Section, Personnel Management Support Branch, testified that there was no record in Swisher's personnel file of any combat or enemy encounters and no applications for citations on Swisher's behalf. Tr. 313-20. Shattuck also testified that there would have been a paper trail of recommendations and approvals for medals or citations awarded given the multiple copies of each document and the required levels of approval.

> Right now I think that I have had the pleasure of sitting next
> to one of the smartest people on the face of the earth, and
> that's got to be my client because, since 1955, he has been
> planning a fraud, and he has been doing it for 50-plus years.

Tr. at 652.

After then quoting language from a September 2, 1955 letter Swisher had written

to his family while stationed in Japan, Dunlap said:

> September 2, 1955, is when this plan, apparently, was
> hatched.  He backed that up in 1956, prior to June. . . .  This is
> one of the most fascinating plans I've ever heard of.  1955,
> 1956, he is planning on defrauding the VA.

Tr. at 653-54.

There are no other such comments during closing.  Tr. 652-67.  Those two

comments in the context of the entire closing and, indeed, the entire trial, do not evidence

anything other than a bit of sarcasm.  It appears that counsel was trying to suggest that the

Government's strategy was to argue that Swisher was laying the groundwork in 1957 to

defraud the VA almost fifty years later.

As the Supreme Court has stated,

> The right to effective assistance extends to closing arguments.
> Nonetheless, counsel has wide latitude in deciding how to
> best represent a client, and deference to counsel's tactical
> decisions in his closing presentation is particularly important
> because of the broad range of legitimate defense strategy at
> that stage.  Closing arguments should "sharpen and clarify the
> issues for resolution by the trier of fact," but which issues to
> sharpen and how best to clarify them are questions with many
> reasonable answers. . . .  Judicial review of a defense

attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas.

*Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (citations omitted) (noting several key points made by counsel in closing).

In his closing, Dunlap stressed a photo depicting Swisher wearing ribbons above the left pocket of his uniform in 1956 while on active duty; the errors, inconsistencies, and omissions in various military records; the testimony of another individual who was stationed at Middle Camp Fuji that Swisher's Company "disappeared" for a long time and that there was "scuttlebutt" that there were huge losses; two other "lifesaving" incidents that led to receiving Navy Marine Corps Medals; the letter he had written home indicating that something "special" was taking place; that Woodring retained Swisher's official record beyond the few days he should have retained it; and his expert's superior methods of determining whether the replacement DD-214 was a forgery as compared with those of the Government's expert. Finally, counsel argued that Woodring had deliberately not submitted the replacement DD-214 because he wanted to seek revenge on Swisher for Swisher's having an affair with his "woman" apparently to sabotage any attempt on Swisher's part to get into the ROTC program.

Isolated comments in an argument must be considered in the context within which they were made. *See, e.g., Cope v. United States*, 272 Fed. Appx. 445, 448-49 (6th Cir. 2008) (noting that each of three isolated comments when considered in context supported

a reasonable trial strategy). Here, Dunlap's comments, though perhaps inartful, were part of his strategy to show the weakness of one part of the Government's case. That strategy was only one among the several employed by counsel. Taken in the context of the entire argument, the comments made in jest are not indicative of deficient performance.

### (4) Failure to File Post-Trial Motions or Advise of Post-Conviction Rights

Swisher claims in Ground Nine, that Dunlap and Groom failed to file post-trial motions and to advise him of his post-conviction rights. He does not allege any grounds upon which a post-trial motion could have been brought. Both Dunlap and Groom state in their respective affidavits that after the verdict, they met with each other, the Swishers, and the handwriting expert and discussed "for hours" grounds for a new trial and for possible appeal following sentencing. *Dunlap Aff.* ¶ 41; *Groom Aff.* ¶ 41. They further discussed the need for new, material evidence to support a new trial motion and assigned each person a series of investigatory tasks. *Id.*, ¶ 42. No new evidence was uncovered. *Id.*, ¶ 43. Swisher does not rebut counsel's statements in his Reply.

It is unclear whether Swisher includes an appeal and a § 2255 motion when he refers to post-conviction rights. However, whether counsel discussed them or not is a moot point because Swisher's new counsel filed a timely notice of appeal and Swisher himself filed a timely § 2255 motion.

### CONCLUSION

Counsel in any trial must make numerous strategic decisions. "Representation is an art, and an act or omission that is unprofessional in one case may be sound or either brilliant in another." *Strickland*, 466 U.S. at 693.

Swisher believes that because counsel made decisions with which he now contends he did not agree, counsel must have made them out of loyalty to Hinkson. However, counsel's decisions are readily explained by other considerations. While the Hinkson family may have wanted to discredit Swisher, there is simply nothing in the record – aside from Swisher's conclusory allegations – indicating that counsel made any decision based on loyalty to Hinkson whom neither had represented for several years. Likewise, there is nothing in the record indicating that counsel's performance was deficient or resulted in any prejudice.

It is apparent that Swisher is given to hyperbole and wild speculation and sees conspiracy in the most innocuous of actions or inactions. It is also apparent that he wanted to be in total control of every decision. Indeed, much of Swisher's argument is essentially that if things had been done his way, he would have been acquitted. However, Swisher focuses on certain evidence that was not sought or certain testimony that was not presented while ignoring the overwhelming evidence against him. Notably, the Court commented at sentencing, "I don't think there was too much doubt there was absolutely no evidence to support his claim which he tried to suggest was the result of some type of covert operation . . . ." *Sent. Tr.* at 72-73.

The Court observed counsel through five days of trial and did not see anything less than zealous advocacy on Swisher's behalf. In fact, at times it was almost overzealous as evidenced by the Court's admonishments of counsel cited by Swisher on appeal. The Court also observed Swisher both personally at trial and in his lengthy allocution at sentencing and through reading his post-sentencing filings.

A review of the entire record, including the trial transcripts, coupled with the Court's own observations, reveals a vigorous defense which did not prevail given the overwhelming evidence that there was no secret mission in North Korea and that Swisher did not receive the medals he claimed to have been awarded.

## REVIEW OF RENEWED § 2255 MOTION

On February 17, 2011, Swisher filed a further § 2255 Motion which was docketed as a Renewed § 2255 Motion. In it, he adopts and includes all grounds contained in the original still pending § 2255 Motion. The Court notes that Swisher did not seek leave of Court to file what is essentially an amendment to his original § 2255 Motion. *See* Fed. R. Civ. P. 15(a)(2). Nevertheless, the Court will address his new claims without requiring a response from the Government.

Swisher bases the motion on what he refers to as newly discovered facts: (1) the Ninth Circuit case of *United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010), *reh'g denied*, 2011 WL 941617 (9th Cir. Mar. 21, 2001), finding the Stolen Valor Act facially invalid under the First Amendment, and (2) the new Department of Veterans Affairs

regulation regarding PTSD claims.  Neither qualifies as newly discovered evidence.  Nor

do they provide grounds for relief under any other theory.

**1.      Unconstitutionality of the Stolen Valor Act**

The Court interprets Swisher's claim that *Alvarez* is a newly discovered fact as a

claim that his conviction under 18 U.S.C. § 704(a) for wearing unauthorized medals is

unconstitutional given the holding in *Alvarez* that Stolen Valor Act violates the First

Amendment.

Because Swisher did not challenge the constitutionality of § 704(a) at trial or on

appeal, he is procedurally barred from raising this issue absent a showing of cause and

prejudice for failing to so raise it on direct review.  *See Bousley v. United States*, 523 U.S.

614, 622 (1998).  However, the Court does not reach the issue of procedural default

because it dismisses Swisher's claim on the ground that *Alvarez* does not apply to

§ 704(a).

The Stolen Valor Act of 2005, 18 U.S.C. § 704,[20] became effective December 20,

_____

[20]  18 U.S.C. §  704 provides as follows:

 (a) In general.--Whoever knowingly wears, purchases, attempts to purchase, solicits for purchase, mails,
ships, imports, exports, produces blank certificates of receipt for, manufactures, sells, attempts to sell,
advertises for sale, trades, barters, or exchanges for anything of value any decoration or medal authorized
by Congress for the armed forces of the United States, or any of the service medals or badges awarded to
the members of such forces, or the ribbon, button, or rosette of any such badge, decoration or medal, or
any colorable imitation thereof, except when authorized under regulations made pursuant to law, shall be
fined under this title or imprisoned not more than six months, or both.

(b) False claims about receipt of military decorations or medals.--Whoever falsely represents himself or
herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for
the Armed Forces of the United States, any of the service medals or badges awarded to the members of

2006.  In short, it expands on the prior versions of § 704 in response to concerns about the

damage to the reputation and meaning of military medals and decorations caused by

fraudulent claims regarding their receipt and the limited ability of federal law

enforcement officers to prosecute fraudulent claims.[21]  152 Cong. Rec. H8819 (daily ed.

Dec. 6, 2006) (statement of the Act's proponent Congressman Salazar).

From 1948 until the enactment of the Stolen Valor Act, § 704(a) had essentially

---

such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.

(c) Enhanced penalty for offenses involving Congressional Medal of Honor.--

(1) In general.--If a decoration or medal involved in an offense under subsection (a) or (b) is a Congressional Medal of Honor, in lieu of the punishment provided in that subsection, the offender shall be fined under this title, imprisoned not more than 1 year, or both.

(2) Congressional Medal of Honor defined.--In this subsection, the term "Congressional Medal of Honor" means--

(A) a medal of honor awarded under section 3741, 6241, or 8741 of title 10 or section 491 of title 14;

(B) a duplicate medal of honor issued under section 3754, 6256, or 8754 of title 10 or section 504 of title 14; or

(C) a replacement of a medal of honor provided under section 3747, 6253, or 8747 of title 10 or section 501 of title 14.

(d) Enhanced penalty for offenses involving certain other medals.--If a decoration or medal involved in an offense described in subsection (a) or (b) is a distinguished-service cross awarded under section 3742 of title 10, a Navy cross awarded under section 6242 of title 10, an Air Force cross awarded under section 8742 of section 10, a silver star awarded under section 3746, 6244, or 8746 of title 10, a Purple Heart awarded under section 1129 of title 10, or any replacement or duplicate medal for such medal as authorized by law, in lieu of the punishment provided in the applicable subsection, the offender shall be fined under this title, imprisoned not more than 1 year, or both.

[21]  Section 704 was enacted in 1948.  However, statutes prohibiting the unauthorized wearing of medals date back to 1924.  *See* Act of February 24, 1923, ch 110.  42 Stat. 1286 (former 10 U.S.C. § 1425) and Act of April 21, 1928, ch 392, 45 Stat. 437 (former 10 U.S.C. § 1425).

criminalized the knowing wearing, manufacturing, or selling of military medals or decorations except when authorized by regulation.  The language was substantially the same as its predecessor statute, the former 10 U.S.C. § 1425.

The present Act now criminalizes several other activities with respect to medals or decorations.  Most notably, the present Act added a new provision criminalizing written or verbal false claims of receipt of military decorations or medals.  *See* § 704(b).  The prior Act provided for enhanced penalties for offenses involving the Congressional Medal of Honor.  *See* § 704(c).  The current Act retains that enhanced penalty provision and adds an enhanced penalty provision for claims involving the Distinguished Service Cross, Navy cross, Air Force Cross, Silver Star and Purple Heart.  *See* §§ 704(c) and (d).

In *Alvarez*, the Ninth Circuit ruled that the Stolen Valor Act violates the First Amendment by regulating pure speech that "is not sufficiently confined to fit among the narrow categories of false speech previously held to be beyond the First Amendment's protective sweep" and by not being "narrowly tailored to achieving a compelling governmental interest."  *Alvarez*, 617 F.3d at 1200.  Notably, the defendant in *Alvarez* had been convicted of falsely verbally claiming to have receive the Congressional Medal of Honor and was thus prosecuted under § 704(b) and the enhancing provision of § 704(c).

The Court respectfully suggests that it is not at all clear that the *Alvarez* decision invalidated § 704(a), the provision under which Swisher was convicted.  The entire

decision as well as the dissenting opinion discussed the pure speech aspects of the § 704(b) without referencing § 704(a) even in passing. Similarly, the decision in *United States v. Strandlof*, No. 09-cr-00497-REB, 2010 WL 4235395, (D.Colo. Jul. 16, 2010), which also found the Stolen Valor Act to be unconstitutional, addressed only § 704(b). On the other hand, the only decisions to have addressed § 704(a), both of which are post-*Alvarez*, have upheld the provision.

The Nevada district court denied the defendant's motion to dismiss the indictment charging him with violating § 704(a) by the unauthorized wearing of a Purple Heart. *See United States v. Perelman*, 73 F.Supp. 2d 1221 (D. Nev. Aug. 19, 2010). The court found that the facts and issues of the case were distinguishable from the facts and issues in *Alvarez* since *Alvarez* only addressed false claims under §§ 704(b) and (c) and not the unauthorized wearing of a medal under § 704(a). *Id*. at 1223 (accepting and adopting the Magistrate Judge's Report and Recommendation submitted prior to the *Alvarez* decision).

Likewise, the district court for the Western District of Virginia upheld the constitutionality of both § 704(a) and § 704(b) specifically rejecting *Alvarez* regarding § 704(b) and making no mention of it in its discussion of § 704(a). *See United States v. Robbins*, No. 2:10CR00006, 2011 WL 7384 (W.D.Va. Jan. 3, 2001).

The Court agrees with the courts in *Perelman* and *Robbins* that the *Alvarez* decision does not implicate § 704(a).

**2.      New Regulation Regarding PTSD**

According to the Department of Veterans Affairs Fact Sheet dated July 12, 2010 submitted by Swisher as Exhibit A (Dkt. 18-1), a new regulation became effective July 13, 2010 regarding claims for PTSD. *See* 38 C.F.R. § 3.304(f). According to the Fact Sheet, the new regulation is applicable to claims and appeals received by the VA on or after the effective date or received before but not yet decided on that date. In recognition of the frequent delayed onset of PTSD and the difficulty in gathering the required documentation, it "liberalizes the evidentiary standard for Veterans claiming service connection for post traumatic stress disorder (PTSD)." *Fact Sheet* at 1.

Swisher submits the Fact Sheet apparently in support of his theory at trial that service records are often incomplete or lost. However, by its terms, the regulation is not applicable to the claim he made with the VA that was the subject of his underlying criminal offense. Swisher attached copies of his recent correspondence with the VA about this new regulation and his new claim made pursuant thereto. Neither is relevant to this case. In any event, given the limiting language in the Fact Sheet, it is doubtful that even the new application will be approved. *See Fact Sheet*, ¶¶ 5 and 8 referring to the requirement that "the claimed stressor is consistent with the places, types, and circumstances of the Veteran's service and the record provides no clear and convincing evidence to the contrary." *See also* 38 C.F.R. § 3.304(f).

## CERTIFICATE OF APPEALABILITY

A § 2255 movant cannot appeal from the denial or dismissal of his § 2255 motion

unless he has first obtained a certificate of appealability. 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b). A certificate of appealability will issue only when a movant has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When, as here, the court has denied a § 2255 motion or claims within the motion on the merits, the movant must show that reasonable jurists would find the court's decision on the merits to be debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000);[22] *Allen v. Ornoski*, 435 F.3d 946, 951 (9th Cir. 2006). Rule 11 of the Rules Governing § 2255 Proceedings provides that the district court must issue or deny a certificate of appealability at the time it enters a final order adverse to the movant. Rule 11(a), 28 U.S.C. foll. § 2255.

After carefully considering the record and the relevant case law, the Court finds that reasonable jurists may find debatable the Court's determination that the Ninth Circuit decision in *Alvarez* does not warrant addressing Swisher's claim regarding his conviction under § 704(a). The Court further finds that reasonable jurists would not find the Court's determination regarding Swisher's claims of ineffective assistance of counsel to be debatable or wrong.

## ORDER

---

[22] The requirements for a certificate of appealability for a § 2255 appeal do not appear to differ from the requirements for a certificate of appealability for a § 2254 habeas petition related to a state conviction. *See United States v. Asrar*, 116 F.3d 1268 (9th Cir. 1997). Therefore, cases addressing the requirements in the context of a § 2254 proceeding are pertinent to a § 2255 proceeding as well.

**IT IS ORDERED:**

1.      Swisher's Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (Dkt. 1) and Renewed Motion Under 28 U.S.C. § 2255 (Dkt. 18) are **DISMISSED**.

2.      A certificate of appealability shall issue only as to the issue of whether *Alvarez* entitles Swisher to relief from his conviction under 18 U.S.C. § 704(a).

DATED:  **April 10, 2011**

Honorable B. Lynn Winmill
Chief U. S. District Judge